IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

In Re:

RODNEY DIXON DORAND,                                  Case No. 21-30205

      Debtor.

_____

THE ESTATES OF ROBERT MOSS AND
BRENDA MOSS, et al.,

      Plaintiffs,

v.                                                   Adversary Case No. 21-3003

RODNEY DIXON DORAND,

      Defendant.

<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING TRIAL</u>

      This adversary proceeding arises out of a failed condominium development on Lake Martin, Alabama during the "Great Recession" of 2007-2009.   The plaintiffs, the Estates of Robert Moss and Brenda Moss by Danae Brown, Executrix, and the Estates of Charles Saunders and Peggy Saunders by Amanda Andrews, Administrator, filed this adversary proceeding for nondischargeability under 11 U.S.C. § 523(a)(2)(A) of a state court judgment against the debtor-defendant Rodney Dixon Dorand resulting from the failed development.[1]

_____

[1] The individual state court plaintiffs are all deceased.   There is no dispute that their estates are the proper parties here.   For ease of reference, the court will refer to the plaintiffs here as either "plaintiffs" or "the creditors."

The court held a trial on June 7 and 8, 2022.   The court heard testimony from the debtor, Alabama attorney Brett Harrison, and Danae Brown (daughter of the Mosses).   It admitted creditors' exhibits 1-65 (hereinafter "cred. ex.") and debtor's exhibits 1-19 (hereinafter "debtor ex.") without objection and creditors' rebuttal exhibit 1 over the debtor's objection.

This is a core proceeding under 28 U.S.C. § 157(b)(2), and the court has authority to enter a final order.   The parties have also consented to the entry of a final judgment by this court.   (*See* joint report, doc. 15).   Having carefully considered the evidence and the applicable law, the court finds that the debtor's debt to the plaintiffs is dischargeable in the debtor's chapter 7 bankruptcy.

## Findings of Fact

The debtor Dr. Dorand has had a long medical career; he also has a law degree but has never practiced law.   Prior to 2006, he had no real estate experience.   From 2005 to 2011, the debtor received long-term disability payments of around $20,000 a month because he could not practice medicine full time due to chronic back issues.

## The Lake Martin project

In 2006, The Carroll & Green Group – a developer out of Birmingham, Alabama – was working on a condominium development in Lake Martin, Alabama referred to in this litigation as "The Bluffs at Copper Creek" or "The Bluffs."   To that end, in February 2006, Lee Carroll and David Green (the "Carroll" and "Green" of The Carroll & Green Group) created Glenwood Development Company, LLC.   Lee Carroll and David Green were the sole members of Glenwood Development.   (*See* Glenwood Dev. articles of org., debtor ex. 1).

2

The debtor was not involved in the idea for The Bluffs and had had limited involvement with The Carroll & Green Group before 2006.   He only knew of the Group because he bought a house from it in Birmingham for his youngest son Dixon (who was attending UAB at the time) and because Dixon worked as a "gopher" at Carroll & Green.   Sometime in 2006, Dixon told the debtor about Carroll & Green's Lake Martin project.   The debtor testified that Carroll & Green approached him, not the other way around.

The debtor provided his personal financial statement (cred. ex. 21) to Carroll & Green in late June or early July 2006,[2] which showed the debtor's net worth at about $7 million.   Lee Carroll also met with the debtor while the debtor was on vacation in California sometime in July 2006.   Carroll provided the debtor a "pro forma" (debtor ex. 19) about the Lake Martin project dated July 12, 2006.   The pro forma projected that the entire project would cost $28.5 million.

The debtor then formed Dorand Development, LLC in late July 2006.   (*See* Dorand Dev. articles of org., debtor ex. 2).   The members of Dorand Development were KAD Away Trust, The Rodney D. and Barbara H. Dorand Living Trust ("the Living Trust"), and The Leigh and Kimberly Dorand Living Trust.[3]   The debtor testified that when he agreed to become part of the Lake Martin project, it was his understanding that Dorand Development would make contributions as a "passive investor" in the project.

---

[2] The debtor believed it was July, although the fax stamp shows late June.   In any case, the court does not attach any significance to this minor discrepancy.

[3] The debtor has three sons: Dixon, Kyle, and Leigh.   KAD Away Trust is the personal trust for Kyle and his wife.   The Leigh and Kimberly Dorand Living Trust is the personal trust for Leigh and his wife.   The Living Trust is the debtor's trust with his then-wife Barbara, who died in 2016.

On September 11, 2006, articles of organization (cred. ex. 14) were filed with the Alabama Secretary of State's Office for "Glenwood-The Bluffs at Copper Creek, LLC."   The stated purpose of the LLC was to acquire the land for the Lake Martin project and to develop that project.   The members of Glenwood-The Bluffs at Copper Creek were Lee Carroll, David Green, Dan Walters, Scott Howell, Dixon Dorand, and Dorand Development.   Glenwood Development (Lee Carroll and David Green) was the initial manager of Glenwood-The Bluffs at Copper Creek.   The debtor has never held an interest in Glenwood Development – individually, through Dorand Development, or through the Living Trust.

<u>The land for the Lake Martin project</u>

The land for the project consisted of five parcels, known as the Cobb Parcel, the Copeland Parcel, the Lopez Parcel, the Hand Parcel, and the Moss Parcel (the subject of this suit).

*The Moss Parcel*

The Moss Parcel was important to the Lake Martin project because it was the only "easy" waterfront access to the lake and thus the only place for a boat dock and ramp.   On July 1, 2006, Glenwood Development entered into a Real Estate Purchase Agreement (debtor ex. 6A; cred. ex. 2) with the Mosses and the Saunderses to buy the Moss Parcel for $450,000.   The agreement was negotiated by realtor Eric Winkler and is signed by Lee Carroll as "Buyer" and by Robert Moss, Brenda Moss, Peggy Saunders, and Charles Saunders as "Sellers."   The "Additional Provisions" section of the agreement contains the following: "Seller to subordinate to primary/1st mortgage holder.   One or more corporation/LLC principals must sign and be

personally responsible for note up to $450,000.   Should the corporation/LLC cease to exist or be unable to pay Sellers require a surety bond in the amount of $450,000."

The debtor, Dorand Development, and the Living Trust were not parties to the purchase agreement for the Moss Parcel and were not involved in the negotiation of the agreement.   The debtor never met the Mosses or the Saunderses, never gave them his personal financial statement, and never authorized anyone to communicate or negotiate with them on his behalf. There is no evidence that the debtor, Dorand Development, or the Living Trust knew about the purchase agreement at the time that it was negotiated and signed, all of which occurred before Carroll met with the debtor in California, before the pro forma, and before the formation of Dorand Development and Glenwood-The Bluffs.   No one discussed anything about the acquisition of the Moss Parcel – including the surety bond requirement – with the debtor, Dorand Development, or the Living Trust.

Lee Carroll and David Green signed a guaranty agreement (cred. ex. 63) dated July 31, 2006, related to the Moss Parcel.   The surety bond was never provided, but the parties closed the transaction anyway.   By general warranty deed (cred. ex. 3) dated July 31, 2006, the Mosses and Saunderses conveyed the Moss Parcel to Glenwood-Silver Hills, LLC.   Glenwood-Silver Hills also signed a mortgage and promissory note (cred. exs. 4, 5) in favor of the sellers dated that date.   A corrective deed and mortgage (cred. exs. 6, 7) were later recorded changing the purchaser/mortgagor to Glenwood-The Bluffs at Copper Creek, LLC.   The Mosses and Saunderses also signed an agreement (cred. ex. 10) to subordinate "their rights under the Security Documents [related to the sale of the Moss Parcel] and payment under the Seller Note if so

5

requested by a Third Party Lender extending . . . Additional Financing [for the Lake Martin project].”

In October and November 2007 – more than a year after signing the purchase agreement and conveying their property – the Mosses and Saunderses asked about the missing surety bond in phone calls to Lee Carroll and Carroll & Green (*see* notes, cred. ex. 65) and a certified mail letter (cred. ex. 64[4]) to “Lee K. Carroll, Glenwood Development Company.”   The debtor (or Dorand Development or the Living Trust) was not copied on the letter and was unaware of the surety bond requirement.   The debtor testified that Lee Carroll never discussed that with “any of them.”

*The Copeland, Cobb, and Lopez Parcels*

The debtor never met the Copelands, the Cobbs, or the Lopezes, either.   In late summer/early fall 2006, the Copeland, Cobb, and Lopez Parcels were conveyed to the debtor and he executed mortgages in favor of Henger Rast & Associates, LLC on those three parcels for a total of $1.675 million.   (*See* deeds and Henger Rast mortgages, cred. exs. 52-57).   He characterized it as a portfolio mortgage from Henger Rast to Glenwood-The Bluffs “in my name.”   The debtor did not have a previous relationship with Henger Rast; he was introduced to the company by Carroll & Green.

The debtor testified that although the deeds and mortgages were in his individual name, this was all part of a package of documents he signed from Henger Rast while he was in Florida recovering from a recent back surgery.   The debtor also testified that Glenwood-The Bluffs

---

[4] This letter also states that personal guaranties were not provided, but plaintiffs’ counsel acknowledged that that was incorrect.

made payments on the mortgages and had asked him to take title to the properties and sign the

mortgages on the Copeland, Cobb, and Lopez Parcels as an accommodation.[5]    The debtor

borrowed $1 million from Sterling Bank – secured by a mortgage on his Florida home ("Blue

Mountain") at the time – to purchase the Copeland, Cobb, and Lopez Parcels for the project,

although he testified that he used about $200,000 to remodel Blue Mountain.    (*See* Sterling

Bank mortgage, cred. ex. 23; Notice of Commencement, cred. ex. 40).    He also executed a

second mortgage (cred. ex. 24) for $580,000 in favor of Henger Rast on his Blue Mountain

house.

*The Hand Parcel*

There was little evidence about this parcel at trial.    The Hands conveyed this parcel to

Leigh Dorand by deed (cred. ex. 60) dated November 15, 2006.

The funding for the Lake Martin project

The debtor did not sign the operating agreement dated October 2006 for Glenwood-The

Bluffs.    However, in March 2007, he signed a document as a principal of Dorand Development

acknowledging that agreement.    (*See* Porter Bridge 56-102, cred. rebuttal ex. 1).

Under Schedule 3.1 to the operating agreement, Dorand Development is listed as a "Class

A" member, with an initial capital contribution of $400,000.    Each member of Dorand

Development (the Living Trust, KAD Away Trust, and Leigh and Kimberly Dorand Living

---

[5] According to the debtor, Glenwood-The Bluffs did make the mortgage payments for about a year, until still things started going downhill as discussed below.    The debtor's agreement to sign as an accommodation is also discussed below related to the operating agreement for Glenwood-The Bluffs.

Trust) contributed about $133,000 each.   Dorand Development is the only "Class A" member of

Glenwood-The Bluffs.

Additional capital contributions to the Lake Martin project are covered in section 4.1(b)

of the operating agreement:

> The Class A Members shall be required to contribute cash to the capital of the
> Company [Glenwood-The Bluffs] as an Additional Capital Contribution in an
> amount sufficient to (i) permit the Company to pay all Operating Expenses (to the
> extent such Operating Expenses (A) exceed funds available from the Company
> Debt for the payment of such Operating Expenses and (B) such Operating
> Expenses were incurred in accordance with the terms of this Agreement; and (ii)
> to fund all equity requirements of a Third Party Lender in connection all approved
> Company Debt.

Section 4.8(a) then states:

> Each Member hereby acknowledges and agrees that they will be required to
> personally guaranty all or any portion of all Company Debt and, in connection
> therewith, to provide personal financial statements and to execute appropriate
> Guaranty Agreements in favor of Third Party Lenders (including, without
> limitation, the Moss Guaranty,[6] the "Guaranty Agreements").

The agreement also discusses the Moss Parcel and the parcels acquired in the debtor's

name:

> **Section 8.10   Moss Property.**   The Company [Glenwood-The Bluffs] acquired
> the Moss Property from the Moss Sellers and, as consideration for same, executed
> and delivered the Moss Note to the Moss Sellers.   The Moss Note is secured in
> part by the Moss Mortgage and the Moss Guaranty.   The Moss Mortgage is
> subject to a Subordination Agreement executed by the Moss Sellers in favor of
> the Company pursuant to which the Moss Sellers have agreed to subordinate the
> Moss Mortgage to any future Third Party Lender if so required by the Company.
> Each Member hereby ratifies and approves the foregoing transactions, the
> Company's obligation under the Moss Note and its pro-rata indemnity and
> contribution obligation (based on its Percentage Interest) to Carroll and Green, as

---

[6] The agreement defines "Moss Guaranty" as the guaranty agreement "dated July 31, 2006,
executed by Carroll and Green for the benefit of the Moss Sellers, whereby Carroll and Green,
jointly and severally, have personally guaranteed the obligations of the Company under the Moss
Note."

the guarantors under the Moss Guaranty, pursuant to Section 4.8 of this Agreement.

**Section 8.11   Dorand Property.**   R. Dorand [the debtor] has acquired in his individual name, as an accommodation to the Company, those certain portions of the Land described as Parcel A, Parcel B, and Parcel C on Exhibit A of this Agreement [the Cobb, Copeland, and Lopez Parcels].   Pursuant to the terms of that certain Purchase and Sale Agreement by and between the Company and R. Dorand (the "Dorand Purchase Agreement"), R. Dorand has agreed to sell, and the Company has agreed to purchase, the aforementioned parcels of the Land pursuant to the terms established thereby (including, without limitation, the seller financing option for Parcel A more particularly described therein).   The Members hereby ratify and approve the Dorand Purchase Agreement and all transactions contemplated thereby.

The debtor testified and the "Projected Loan Summary" of the "pro forma" (debtor ex. 19) corroborates that there was never an expectation that the debtor or Dorand Development would provide all of the projected $28.5 million necessary for the Lake Martin project.   The expectation was that Glenwood-The Bluffs would borrow money to complete the project as condominium pre-sales occurred.

The Porter Bridge loan for the Lake Martin project

In March 2007, Glenwood-The Bluffs obtained a six-month loan of $1.7 million at 15% interest from Porter Bridge Loan Company.   (*See* Porter Bridge loan info., cred. ex. 41). According to the debtor, the Porter Bridge loan was "designed to pay off Henger Rast."   The Porter Bridge loan paid off the Henger Rast mortgages in the debtor's name related to the Lopez and Cobb Parcels and satisfied the debtor's mortgage in favor of Henger Rast on Blue Mountain. It also paid off the Hand Parcel.   However, the Porter Bridge loan did not pay the Mosses and Saunderses for the Moss Parcel and did not pay off the Copeland parcel.   All of the parcels were

mortgaged to Porter Bridge, including a first mortgage on the Moss Parcel.[7]   (*See* Porter Bridge mortgage, cred. ex. 9).

The debtor did not negotiate the terms of the disbursements from Porter Bridge and did not receive any proceeds from Porter Bridge.   The debtor testified that the Porter Bridge loan was taken out at the beginning of the Great Recession when creditor markets "went to pot" and "things were just going downhill."   The debtor did not want the Lake Martin project to fail, so he personally guaranteed the Porter Bridge loan and granted Porter Bridge a second mortgage on Blue Mountain for approximately $900,000 (Sterling Bank still had a first mortgage for $1 million).

The downfall of the Lake Martin project

Glenwood-The Bluffs did not pay the Porter Bridge loan when it came due in fall 2007. In October 2007, the Birmingham Business Journal ran an article (cred. ex. 26) entitled "Carroll & Green Group closes its doors, blames slow real estate market."   Lee Carroll and David Green filed for bankruptcy in December 2007.   Porter Bridge foreclosed on its collateral, including the Moss Parcel, in 2010.

According to the debtor, he tried to keep the Lake Martin condo project alive by pitching it to several lenders across the Southeast, but no one was willing to lend money to complete the project.   Around this time the debtor first became involved in the day-to-day operations of the project, including changing the manager of Glenwood-The Bluffs at Copper Creek from Glenwood Development to Dorand Development.   He requested financial records from Lee

---

[7] The undersigned asked if there was a subordination agreement with Porter Bridge related to the Moss Parcel but was told that if there was one, "we don't have it."

Carroll and David Green, but he received nothing and they could not explain what happened to the funds used to finance the project.

In August 2008, the debtor obtained a loan from Wells Fargo in the amount of $1,999,900 secured by Blue Mountain.   (*See* Wells Fargo mortgage, cred. ex. 36).   He used the Wells Fargo loan to pay off Sterling Bank's $1 million first mortgage on Blue Mountain and Porter Bridge's $900,000 second mortgage.   The debtor continued to look for alternative financing for the Lake Martin project through 2011, when his disability payments ended and he could not afford to continue.

Ultimately, the debtor did not pay back the Wells Fargo loan and Wells Fargo began foreclosure proceedings on Blue Mountain in 2012.   The debtor and Wells Fargo agreed to a short sale of Blue Mountain; the debtor did not receive any proceeds from the sale.

The state court lawsuit related to the Lake Martin project

In July 2009, the Mosses and Sauderses filed a verified complaint in the Circuit Court of Tallapoosa County, Alabama, against the following named defendants: the debtor; Glenwood-The Bluffs at Cooper Creek, LLC; Glenwood Development, LLC; Glenwood-Silver Hills, LLC; Dorand Development, LLC; The Rodney D. and Barbara H. Dorand Living Trust; Leigh Dorand; The Leigh and Kimberly Dorand Living Trust; Eric Winkler; The Porter Bridge Loan Company; KAD Away Trust; and Joe F. Lassiter.   (*See* compl., cred. ex. 1).   The state court complaint – which was amended twice in 2010 – includes allegations of breach of contract and fraud.   (*See id.*; am. compl., cred. ex. 11; sec. am. compl., debtor ex. 7).

In January 2015, the Circuit Court of Tallapoosa County, Alabama entered a judgment

(debtor ex. 8) for the plaintiffs for $1.6 million against the debtor and others.   The defendants,

including the debtor, did not appear for trial.   The state court order states in its entirety:

Order

This case having come before the Court for a jury trial docket on March 26, 2014.   The case was called for trial.   The Plaintiffs Robert Moss and Brenda Moss were present and both they and the Plaintiffs Charles Saunders and Peggy Saunders were represented by counsel, Donald R. Harrison.   The Defendants Glenwood-The Bluffs at Copper Creek, LLC, Glenwood Development, LLC, Dorand Development, LLC, Rodney Dorand, The Rodney D. and Barbara H. Dorand Living Trust, Leigh Dorand, The Leigh and Kimberly Dorand Living Trust and KAD Away Trust were not present and their counsel had previously withdrawn from the case.   The Plaintiffs sought Default Judgment and provided testimony regarding liability upon fraud, breach of contract and fraudulent concealment and also provided testimony regarding damages.

Upon consideration of the evidence, it is the opinion of this Court that Default Judgment should and is hereby granted.

Therefore, it is ORDERED, ADJUDGED, and DECREED that Judgment is hereby granted in favor of the Plaintiffs Robert Moss, Brenda Moss, Charles Saunders and Peggy Saunders, and against the and against the Defendants Glenwood-The Bluffs at Copper Creek, LLC, Glenwood Development, LLC, Dorand Development, LLC, Rodney Dorand, The Rodney D. and Barbara H. Dorand Living Trust, Leigh Dorand, The Leigh and Kimberly Dorand Living Trust and KAD Away Trust, both separately and severally for One Million Six Hundred Thousand Dollars ($1,600,000.00) together with costs herein.

DONE this 26th day of January, 2015.

/s/ RAY D. MARTIN         <br>CIRCUIT JUDGE

The state court record (cred. ex. 45) does not reflect a trial in March 2014 and does not

show that anything took place on March 26, 2014.   There is no transcript of the March 2014

trial.   Instead, the state court record shows that the case was set for jury docket calls in June

12

2014 and January 2015, that a proposed order was submitted on January 26, 2015, and that the court entered a "default judgment" that same day.

After the state court plaintiffs began collection efforts in 2019 and 2020, the debtor filed a chapter 7 bankruptcy in this court in April 2021.   The plaintiffs then filed this nondischargeability proceeding related to the state court judgment.

Conclusions of Law

The plaintiffs contend that (1) this action is barred by the doctrine of issue preclusion; and (2) they have proven the elements of their § 523 claim.   The court discusses each argument below.

Issue preclusion (also known as collateral estoppel)

Because an Alabama state court issued the underlying order, this court applies Alabama issue preclusion to determine the order's preclusive effect.   *See In re Harris*, 3 F.4th 1339, 1344 (11th Cir. 2021).   There is no dispute about the identity of the parties in the state court case and this one.   Thus, for issue preclusion to apply under Alabama law:

(1)   the issue must be identical to the one involved in the previous suit;

(2)   the issue must have been actually litigated in the prior action; and

(3)   the resolution of the issue must have been necessary to the prior judgment.

*See Lee L. Saad Constr. Co. v. DPF Architects, P.C.*, 851 So. 2d 507, 520 (Ala. 2002).   "'Only issues *actually decided* in a former action are subject to" issue preclusion.   *See id.* (citation omitted) (emphasis in original).   "Because of the difficulty in determining whether there is an identity of issues between state court actions and subsequent dischargeability actions, any

reasonable doubt as to what was decided by a prior judgment should be resolved against using it as an estoppel."   *In re Harris*, 3 F.4th at 1346 (citation, quotation marks, brackets, and ellipses omitted).

"Section 523(a)(2)(A) excepts certain debts from discharge if the debt was 'obtained by' 'false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.'"   *In re Jones*, 611 B.R. 685, 693 (Bankr. M.D. Ala. 2020) (citing 11 U.S.C. § 523).   "A prior fraud judgment, if the elements coincide with the [the elements of § 523(a)(2)(A)], can have [preclusive] effect in dischargeability proceedings in bankruptcy court."   *See id.*

Those elements are:

(1)  that the debtor used false pretenses, or made a false representation, or committed actual fraud;

(2)  that the creditor relied on the debtor's conduct;

(3)  that that reliance was justified; and

(4)  that the debtor's conduct caused the creditor's loss.

*See In re Harris*, 3 F.4th at 1344.

The first problem is that the state court entered a "default judgment."   Under Alabama Rule of Civil Procedure 55(b), "judgment by default may be entered by the court on the day the case is set for trial . . . ."   But such judgment will not support the application of issue preclusion. *See, e.g.*, *Malfatti v. Bank of Am., N.A.*, 99 So. 3d 1221, 1225-28 (Ala. 2012); *In re Campbell*, No. 14-80037-JAC-7, 2014 WL 3955217, at *2 (Bankr. N.D. Ala. July 23, 2014).

Assuming that the state court judgment was on the merits, it still is not entitled to preclusive effect.   There is no transcript of the hearing for the court to determine whether the state court made findings on the record, and the state court order entered almost a year after the hearing lacks specific factual findings.   Nor does the order state that the court found in favor of the plaintiffs on the fraud claim.   *See In re Bennitt*, 348 B.R. 820, 828-29 (Bankr. N.D. Ala. 2006) (for a state court order "'to have collateral estoppel effect in a bankruptcy court, it must be clear that the factual determinations made by the trier of fact parallel the facts necessary to meet the federal standard of nondischargeability'") (citation omitted).

The state court merely stated that the plaintiffs gave testimony about "liability upon fraud, breach of contract and fraudulent concealment" as well as damages.   The state court then concluded that "[u]pon consideration of the evidence, it is the opinion of this Court that Default Judgment should and is hereby granted."   The court did not state whether it was entering a judgment on all claims, just the fraud/fraudulent concealment claims, or just the breach of contract claim.   And the court did not allocate between amounts awarded for breach of contract or fraud/fraudulent concealment.   The court could have accepted the testimony on breach of contract only and entered a judgment for $1.6 million only on the contract claim.   The state court order is like a general verdict, which is not given preclusive effect under Alabama law when it is unclear what issues were decided.   *See In re Bennitt*, 348 B.R. at 829-30 and n.6.

This is not a case like *In re Jones*, 611 B.R. 685, where the state court judgment was encompassed "[i]n a detailed Memorandum of Decision" in which the court "combed through each count of the Complaint" and included comprehensive findings of actual fraud.   *See id.* at 690-91.   But even if the state court order included specific findings about fraud, not all types of

15

fraud under Alabama law will support a judgment of nondischargeability.   *See In re Bennitt*, 348

B.R. at 825 (the "standard for proving nondischargeable fraud in a bankruptcy context is far

stricter than proof of certain types of fraud under state law").

> As explained by one Alabama bankruptcy court:

> > In regard to the identity of issues between the fraud that must be proved for nondischargeability and the fraud that case exist under Alabama law, there can be quite a difference.   'Fraud' in Alabama is the extensive subject of many statutes and judicial opinions.   Unlike nondischargeable fraud, there are different types of fraud in Alabama law with varying degrees of intent.   For example, section 6-5-101 of the Code of Alabama provides, 'Misrepresentations of material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud.'   Under section 6-5-101, a false representation, even if made by mistake or innocently, is actionable and entitles a plaintiff to compensatory damages.   Fraudulent intent, or an intent to deceive, is not essential to a recovery under that section.   Neither is knowledge by the defendant of the falsity of his or her representations.

> > Thus, Alabama law demonstrates that the standard of proof for certain types of fraud under state law is far less than the standard for proving nondischargeable fraud in the bankruptcy context.

*In re Wallis*, No. 10-00010-BGC-7, 2011 WL 2357365, at *9 (Bankr. N.D. Ala. Mar. 31, 2011)

(citations omitted).

> The plaintiffs offered the testimony of attorney Brett Harrison whose father, Donald

Harrison, represented the Mosses and Saunderses in the state court case but has since died.   Mr.

Harrison testified that his father was sick during the state court case and that he was helping his

father, including with the presentation of evidence in the form of testimony from the Mosses (the

Saunderses were not present).   Mr. Harrison also testified that the state court judge heard

"overwhelming" evidence of fraud but did not provide any specifics.   In large part, though, the

court finds Mr. Harrison's opinion about the testimony that the state court judge heard irrelevant

16

because the court still has no record in front of it – and there is nothing in the judgment – that shows that the state court judge accepted or relied on any of that evidence.   Likewise, although the plaintiffs' verified state court complaint constitutes evidence in the state court, *see Henley v. Kanizai*, 143 So. 3d 186, 193 (Ala. Civ. App. 2013), there is nothing in the record demonstrating that the state court judge accepted or relied on that evidence.

The purchase agreement for the Moss Parcel was for $450,000 and the plaintiffs included that amount in their state court complaint.   Mr. Harrison testified that the judge must have found fraud because the plaintiffs requested $400,000 (not $450,000) for breach of contract and then three times that amount, or $1.2 million, for a total damages award of $1.6 million.   The plaintiffs argue that the $1.6 million judgment shows that the state court awarded them punitive damages on the fraud claim.

As noted above, *see In re Harris*, 3 F.4th at 1346, this court must resolve reasonable doubt as to what was decided by the state court judgment against using it as an estoppel.   The state court judgment contains no specific findings of fraud or otherwise.   It does not identify the nature of the fraud that was pleaded or proven, does not delineate between any damages awarded for breach of contract versus any damages awarded for fraud, and does not mention punitive damages, much less make findings on the elements necessary to award punitive damages under Alabama law.   For example, the state court's award of $1.6 million – even accepting that only $400,000 was for breach of contract[8] – could have included additional compensatory damages of $1.2 million for fraud that would not support a nondischargeability judgment or a punitive

---

[8] The plaintiffs have never addressed that only that portion of any damages attributable to fraud would be nondischargeable.   *See, e.g.*, *In re Morrow*, 508 B.R. 514, 523 (Bankr. N.D. Ga. 2014).

damages award.   *See* Ala. Code § 6-11-20 (defining "fraud" that will support punitive damages as "[a]n intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury"); *In re Bennitt*, 348 B.R. at 826 (not all fraud supports punitive damages under Alabama law); *In re Wallis*, 2011 WL 2357365, at *9.

This court also cannot infer fraud from an award of punitive damages because the record here is inconclusive as to whether or how much punitive damages were awarded.   *See In re Bennitt*, 348 B.R. at 829 ("If the jury had indicated, in its verdict, that any portion of the damages awarded were punitive, rather than compensatory, it could be inferred that its verdict was based on the plaintiffs' fraud count.").   The plaintiffs characterize this problem as "inartful drafting" by Mr. Harrison, the Alabama attorney who submitted the proposed "default judgment."   But that does not change the fact that this court has nothing before it except the state court judgment from which it can infer anything about what the state court actually decided.   *See Lee L. Saad Constr. v. DPF*, 851 So. 2d at 520; *see also, e.g.*, *In re Tashbar*, No. 6:09-ap-00069-ABB, 2012 WL 2150327, at *3 (Bankr. M.D. Fla. June 12, 2012) (state court judgment did not have preclusive effect on the elements of a § 523(a)(2)(A) claim because the judgment did not "contain findings of fact or conclusions of law establishing any of the elements of" a nondischargeability claim under that section).   The state court judgment is not entitled to preclusive effect.

Elements of § 523(a)(2)(A)

The plaintiffs' § 523(a)(2)(A) nondischargeability claim is "a matter of federal law governed by the terms of the Bankruptcy Code."   *See In re Harris*, 3 F.4th at 1345 (citation and quotation marks omitted).   The plaintiffs must prove the elements of that claim by a preponderance of the evidence.   *See id.* at 1344-45.   "'[I]ntertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start.'"   *See id.* at 1345 (citation omitted).

Section 523(a)(2)(A) refers to "false pretenses, a false representation, or actual fraud" and the elements of each necessarily overlap.   In any case, courts generally interpret that section "'to require the traditional elements of common law fraud.'"   *See In re Allegro Law LLC*, 545 B.R. 675, 720 (Bankr. M.D. Ala. 2016) (citation omitted); *see also In re Harris*, 3 F.4th at 1344. Those elements include proof that "[t]he debtor made a false representation of a past or current material fact [w]ith the intent to deceive the creditor[,]" justifiable reliance, and proximate cause. *See In re Allegro Law*, 545 B.R. at 721 (cited in the creditors' trial brief, doc. 71); *see also In re Harris*, 3 F.4th at 1344.   "Intent is a subjective issue and a review of the totality of the circumstances is relevant in determining a debtor's intent."   *In re Lorenzo*, 434 B.R. 695, 708 (Bankr. M.D. Fla. 2010).

The court addresses each element of the plaintiffs' § 523(a)(2)(A) claim below.   In short, the plaintiffs have failed to meet their burden of proof by a preponderance of the evidence on each element of their § 523 claim.

(1) False representation with intent to deceive

The court rejects the plaintiffs' contention at trial that the debtor agreed to fund the entire Lake Martin project to the tune of $28.5 million.   There is no evidence of a representation (direct or implied) by the debtor at any point that he could or would fund the entire project.   The court finds the debtor's testimony credible that there was never an expectation that he (or Dorand Development) would fund all or even most of the project; instead, Glenwood-The Bluffs would borrow money to complete the project as pre-sales occurred.   While the plaintiffs argue that the debtor is bound under the operating agreement, at most that agreement stated that Dorand Development as the only "Class A" member – not the debtor individually – would provide certain contributions, and it does not contemplate specific amounts.   Even if the operating agreement could be the basis of a § 523(a)(2)(A) claim (which the court doubts) as opposed to a breach of contract claim, Dorand Development – not the debtor individually – is the party to the agreement and there is no allegation to pierce the corporate veil of Dorand Development.   And the debtor is not even a member of Dorand Development – the Living Trust is.

Despite the argument of the plaintiffs' attorney that the debtor made "multiple representations about performance," the single representation identified is the representation about a surety bond made in the purchase agreement between Glenwood Development, the Mosses, and the Saunderses for the Moss Parcel.   But this representation was not made by the debtor, who was not involved in the purchase agreement and has never been (himself, through Dorand Development, or through the Living Trust) a member of Glenwood Development.   *See In re Carter*, 593 B.R. 354, 360 (Bankr. M.D. Fla. 2018) (for § 523(a)(2)(A), "the action or representation at issue must be one taken by *the debtor*") (emphasis in original).   There is no

evidence that the Moss purchase agreement was entered into on the debtor's account or direction. The debtor did not learn about the Moss purchase agreement until after the fact, and he (or Dorand Development or the Living Trust) never made a representation to the Mosses or Saunderses or authorized anyone to communicate or negotiate with them about the Moss Parcel or otherwise. Dorand Development did not exist when the purchase agreement was signed, and no one discussed the surety bond with the debtor, Dorand Development, or the Living Trust.

There is another fundamental problem with the surety bond requirement as the basis of the plaintiffs' § 523(a)(2)(A) fraud claim. The promise of a surety bond – presumably made by Eric Winkler or Lee Carroll as a principal of Glenwood Development[9] – does not mean that it was falsely made with intent to deceive. No one involved in the negotiation or execution of the purchase of the Moss Parcel testified at trial, and the only evidence from which the court could infer fraud was that the surety bond was never provided, which the court finds insufficient to prove fraud. *See, e.g.*, *In re Cascio*, 568 B.R. 851, 858 (Bankr. M.D. Fla. 2017); *Matter of Chaney*, 596 B.R. 385, 397-98 (Bankr. N.D. Ala. 2018).

Assuming that Eric Winkler or Lee Carroll or someone involved in the negotiation and execution of the purchase of the Moss Parcel made a false representation, the court finds that the debtor did not and that such fraud cannot somehow be imputed to the debtor. The plaintiffs argue that the debtor "ratified" the purchase agreement and the surety bond term through the operating agreement for Glenwood-The Bluffs. (*See, e.g.*, cred. trial br., doc. 71, at p.16) ("Dorand and the Bluffs ratified this contract and assumed the obligations of performance under

---

[9] These are the parties mentioned in the creditors' trial brief but this analysis applies equally to anyone else that the plaintiffs say were involved in the initial purchase agreement for the Moss Parcel.

21

this contract."). Even so, any ratification was by the members of Glenwood-The Bluffs – which only includes Dorand Development, not the debtor individually. Such ratification and assumption of obligations of performance may give rise to a breach of contract claim against the members of Glenwood-The Bluffs but does not make the members (which did not include the debtor individually anyway) liable for fraud.

Regardless, for ratification, the plaintiffs must show that the debtor "had actual knowledge of [Glenwood Development's or Winkler's] allegedly fraudulent conduct[.]" *See Pescia v. Auburn Ford-Lincoln Mercury Inc.*, 68 F. Supp. 2d 1269, 1283 (M.D. Ala. 1999). There is no evidence that Dorand knew about the surety bond requirement or, if he did, that he knew that Glenwood Development, Winkler, or anyone else did not intend on performing (which, as discussed above, there was no evidence on except that the surety bond was not provided). Lastly, ratification requires that the act was "done or professedly done" on the debtor's account, and there is no evidence of that in this case. *See id.* (citation and quotation marks omitted). The debtor had not agreed to participate in the Lake Martin project and had not formed Dorand Development when Glenwood Development entered into the purchase agreement with the Mosses and Saunderses containing the surety bond requirement. In fact, Glenwood-The Bluffs did not even exist when Glenwood Development obtained the Moss Parcel.

The same is true for the plaintiffs' theories that the debtor "may also have respondeat superior liability for the fraud of anyone acting as his agent, employee, or servant[,]" or that the debtor is liable based on "vicarious liability and imputation of fraud[.]" (*See* cred. trial br., doc. 71, at pp. 15-17). There is no evidence that Glenwood Development, Eric Winkler, or anyone else was the debtor's agent in obtaining the Moss Parcel, much less the "sufficient evidence"

22

needed to prove an agency relationship. *See In re Heinz*, 501 B.R. 746, 759 (Bankr. N.D. Ala. 2013) ("[I]n Alabama, the test for agency is whether the alleged principal has retained a right of control over the actions of the alleged agent. . . .   The party asserting the existence of an agency has the burden of presenting sufficient evidence to prove the existence of that relationship.") (citations and quotation marks omitted).   Similarly, vicarious liability or imputed fraud requires an agency relationship and there was none. *See generally In re Villa*, 261 F.3d 1148 (11th Cir. 2001).   The court also rejects the argument that Glenwood Development or Winkler were the debtor's "after the fact" agent based on Dorand Development's ratification of the Moss purchase agreement through the operating agreement for Glenwood-The Bluffs.   Again, this may be a breach of contract by the members of Glenwood-The Bluffs (*i.e.*, Dorand Development), but not the debtor individually.

Finally, reviewing the totality of the circumstances, the plaintiffs did not meet the burden to show that the debtor had the requisite intent to deceive.   While this project turned out to be a terrible situation for all involved – as with many real estate investors in the 2007-2009 timeframe – the court does not find that any action by the debtor rises to the level of fraud required to sustain a § 523(a)(2)(A) claim.   The debtor did not agree to invest in the Lake Martin project intending that it would fail, and he himself eventually lost his house after his attempts to keep the project afloat failed.   And there is no evidence that the debtor had any intent – much less fraudulent intent – related to a surety bond requirement in a purchase agreement to which he (or Dorand Development or the Living Trust) was not a party.

(2) Justifiable reliance

Even if the court found that the debtor had made representations that he could fund the entire Lake Martin project, there is no evidence that the Mosses or Saunderses relied on any representation by the debtor or even knew of the debtor's involvement with the project when they agreed to sell the Moss Parcel to Glenwood Development.   They had never met the debtor, and there is no evidence that they knew who he was or about Dorand Development's involvement in the project; they signed the purchase agreement before Dorand Development or Glenwood-The Bluffs were even formed.

Turning to the surety bond, even if the court found that the debtor somehow made or was liable for a false representation related to the surety bond, the Mosses and Saunderses did not rely on that representation because they closed on the sale without insisting on the surety bond. *See, e.g.*, *In re Moore*, 559 B.R. 243, 260 (Bankr. M.D. Fla. 2016) ("the alleged misrepresentation must have occurred and been relied upon when the debt was incurred"); *see also In re Lorenzo*, 434 B.R. at 708 ("A creditor cannot establish non-dischargeability pursuant to Section 523(a)(2)(A) without proof of reliance on intentional misstatements by the debtor."). It was over a year later, when the market had collapsed, that the Mosses and Saunderses started asking about the surety bond.

(3) Proximate cause

This element requires that the debtor's conduct caused the plaintiffs' loss.   *See In re Harris*, 3 F.4th at 1344.   As for funding the project, the court finds that there is no evidence that any representation by the debtor caused the plaintiffs' loss.   As for the surety bond, the causation element is not met for many of the same reasons discussed above; no conduct by the

debtor contributed to the plaintiffs' loss based on Glenwood Development's failure to obtain a surety bond.

## Conclusion

The court finds in favor of the debtor-defendant Rodney Dixon Dorand and against the plaintiffs under 11 U.S.C. § 523(a)(2)(A).   The court will enter a separate final judgment consistent with this order.

Dated:   July 6, 2022

HENRY A. CALLAWAY
U.S. BANKRUPTCY JUDGE